IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MANOSIJ ROY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-183 (RDA/WBP) |
| | ) |
| GUIDEHOUSE, INC., | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Guidehouse, Inc.'s Motion for Summary Judgment (Dkt. 25) (the "Motion").  This Court has dispensed with oral argument as it would not aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has been fully briefed and is now ripe for disposition.  Considering the Motion together with the Memorandum in Support (Dkt. 26), Opposition (Dkt. 30), and Reply (Dkt. 31), this Court GRANTS the Motion for the reasons that follow.[1]

### I.   PROCEDURAL BACKGROUND

On February 3, 2024, Plaintiff Manosij Roy filed the instant Complaint.  Dkt. 1.  On April 26, 2024, Defendant Guidehouse, Inc. filed an Answer.  Dkt. 6.  Following discovery, on October

---

[1] Except with respect to citations to transcripts of deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

17, 2025, Defendant filed its Motion for Summary Judgment. Dkt. 25. On November 4, 2025, Plaintiff filed an Opposition. Dkt. 30. On November 10, 2025, Defendant filed a Reply. Dkt. 31.

## II.     UNDISPUTED STATEMENT OF FACTS

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56. The Court notes that, although the parties largely complied with the Rules, in his Opposition, Plaintiff also set forth his own "Statement of Additional Material Facts." Dkt. 30 at 12. Neither the Rules nor case authority permit this. *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 981 (E.D. Va. 2017); *Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773, 777–78 (E.D. Va. 2021) (refusing to consider a plaintiff's separate enumerated statement of facts opposing summary judgment), *vacated and remanded on other grounds sub nom. ImmunoGen, Inc. v. Hirshfeld,* 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) (recognizing that it "is from [the movant's] statement of undisputed facts and the nonmovant's response that a district court determines whether genuine issues of fact are disputed"). Nonetheless, the Court takes into account Plaintiff's asserted facts where appropriate and, even where not recounted below as undisputed facts, the Court considered all of the facts proffered by Plaintiff in reaching a decision.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's statement of undisputed facts; (ii) Plaintiff's response to those facts; and (iii) the summary judgment record as a whole. The undisputed facts are as follows:

1. On August 21, 2022, Guidehouse, Grant Thornton Public Sector LLC ("GTPS"), and Grant Thornton LLP ("GT") entered into an Agreement and Plan of Merger. Under that Agreement and Plan of Merger, GTPS would merge with and into Guidehouse, and Guidehouse would continue as the surviving entity (the "Acquisition").

2. The Acquisition closed on September 30, 2022.

3. As a result of the Acquisition, more than 1,100 legacy GTPS employees and 41 legacy GT or GTPS Partners, Principals, and Managing Directors (referred to as "PPMDs" at GT and GTPS), including Roy, became employees of Guidehouse as of October 1, 2022, creating a combined workforce of more than 15,000 professionals worldwide.

2

4. PPMDs were the senior leaders at GT and GTPS.

5. Prior to the Acquisition, Roy was a Managing Director ("MD") at GTPS, who spent a majority of his working time on the Transportation Security Administration ("TSA") Program Analysis and Strategic Support ("PASS") engagement; Roy and a team of dozens of GTPS employees helped win the TSA PASS engagement in early 2021 after a year-and-a-half long pursuit that began prior to Roy's involvement.

   a. Roy was noted in the bid as one of four key personnel and as the program manager based on the solicitation criteria.

6. GT Principal Mike Eder led the TSA PASS pursuit and ongoing engagement, with Roy serving as the project manager of the engagement.

7. Guidehouse did not use a PPMD model. Instead, its senior leaders were Partners and Directors.

8. Accordingly, in connection with the Acquisition, GT Partners and Principals became Guidehouse Partners, and GTPS MDs (like Roy) became Directors of Guidehouse.

9. At the time of the Acquisition, Guidehouse organized its business into various segments and lines of business, including Defense & Security ("D&S"); Health; Financial Services; Energy, Sustainability, and Infrastructure ("ES&I"); State & Local Government; Technology Advisory; Managed Services; and Corporate Services.

10. After the Acquisition, the GT and GTPS PPMDs were assigned to various segments and lines of business at Guidehouse.

11. Guidehouse assigned Roy to the D&S segment in view of his work on the TSA PASS engagement, which was the only active engagement he worked on during his employment at Guidehouse.

12. In connection with the Acquisition, Guidehouse expected to offer each of the 41 legacy GT and GTPS PPMDs (including Roy) and certain legacy non-PPMDs a retention incentive in the form of Class B Membership Interest in Guidehouse Holdings LLC ("Holdings"), subject to the terms and conditions of the limited liability company agreement of Holdings (the "Holdings Operating Agreement").[2]

13. Guidehouse leadership determined both the eligibility and anticipated percentages for potential Class B equity retention grants.  Guidehouse also consulted GT and GTPS PPMD

---

[2] Defendant asserted that Guidehouse "decided" to offer the retention incentive.  Dkt. 26 ¶ 12.  Plaintiff partially disputed this asserted fact, noting that the cited transcript states that Guidehouse "expected" that each would receive a retention incentive and that these were "potential grants."  Dkt. 30 ¶ 12 (citing Dkt. 26-5 at 18:4-20:12).  Although the distinction does not appear material, the Court has modified the fact accordingly.

senior leadership regarding the selection and priority for employees potentially eligible for a Class B equity retention grant.

14. GT and GTPS PPMD senior leadership consulting on the selection and priority for the potential Class B equity retention grants consisted of Carlos Otal (a GT Partner and leader of GTPS), Shivendra Verma (a GT Principal and GTPS solutions leader), and Vernon Butler (a GT Principal and GTPS growth leader and Defense and Homeland Security accounts leader).

15. Prior to the Acquisition, Guidehouse informed all GT and GTPS PPMDs and nonPPMDs who were expected to receive a Class B equity retention grant of their potential grants. Scott McIntyre, Chief Executive Officer of Guidehouse, spoke with most of the GT and GTPS PPMDs, including Roy, about the potential grants, informing them that details would be forthcoming.

16. Roy received notice of his potential Class B equity retention grant by letter dated September 30, 2022.

17. Roy's Class B notice of grant letter stated, among other things, (i) the expected percentage of Class B Membership Interest in Holdings to be awarded; (ii) that such Class B interest would be governed by the Holdings Operating Agreement; (iii) that the notice of grant letter did not constitute the grant of the Class B interest, and that the actual grant and documents would be provided at a later date; and (iv) that the notice of grant letter did not guarantee that Guidehouse would employ Roy for any specific time period.

18. Guidehouse expected that all GT and GTPS PPMDs and certain non-PPMDs would receive a Class B equity retention grant of no less than 0.0084112%.

19. Pursuant to his Class B notice of grant letter, Roy was to receive the minimum Class B equity retention grant of 0.0084112%.[3]

20. As Guidehouse integrated GTPS into its business, it identified areas of inefficiency and redundancy, resulting in a nationwide, multiphase reduction-in-force ("RIF").[4]

21. RIF termination decisions were implemented in three phases, in November 2022, February 2023, and June 2023.

---

[3] Plaintiff disputes that Defendant has sufficiently supported the assertion that this was the minimum grant. Dkt. 30 ¶ 19. However, this fact is supported by the record. Dkt. 26-8 at 4-6. Accordingly, Plaintiff fails to dispute this fact.

[4] In Opposition, Plaintiff attempts to partially dispute this and similar facts based on Defendant's corporate designee's testimony that, "considering synergies and having two or three people in a box," to her knowledge, no one else "was . . . in a box with Mr. Roy." Dkt. 30 ¶¶ 20, 26, 27, 30 (citing Dkt. 26-5 at 34:16-20). The Court finds that this vague statement does not create a genuine dispute of fact as to any of the facts asserted.

4

22. The overall RIF resulted in 109 terminations across Guidehouse's various segments and lines of business.

23. Eighty of the 109 employees (approximately 73.4%) selected for termination in the RIF were legacy employees of Guidehouse, while the other 29 employees (approximately 26.6%) selected for termination were legacy employees of GT or GTPS who had joined Guidehouse in connection with the Acquisition.[5]

24. Guidehouse selected 49 employees for termination in the first phase of the RIF (November 2022), 45 employees in the second phase of the RIF (February 2023), and 15 employees in the third phase of the RIF (June 2023).

25. RIF termination selection decisions were made by Guidehouse segment leaders, on a segment-by-segment basis.[6]

---

[5] In Opposition, Plaintiff asserts that, "in Wave 1 of the RIF, all four Asians selected for termination were legacy GTPS and were also Indian-Americans." Dkt. 30 ¶ 23. However, the citation that Plaintiff provides appears to support only that there were four Asians selected for termination in Wave 1 of the RIF (which is noted as not statistically significant). Dkt. 26-7 at 51. This information is not related to and does not contradict the asserted fact. Accordingly, Plaintiff fails to dispute this fact.

[6] In Opposition, Plaintiff attempts to partially dispute this and similar facts based on then-D&S segment leader Munier John Saad's testimony that he relied on Vern Butler to assess the GT and GTPS PPMD leaders in D&S and did not second-guess him. Dkt. 30 ¶¶ 25, 28, 29, 30, 53, 54, 109. In part, Saad testified as follows:

Q. Okay. Were there any commonalities in terms of what you were looking for when you were making these selections, what were the commonalities among the people that were selected?

A. The way I – we approached the process was to ask the leaders of the respective businesses to determine who they needed to effectively run that part of the business and support the client and grow the business.

***

Q. Okay. Do you recall if you had any role in selecting whether Mr. Roy was included in this reduction of force?

A. I asked my leaders to provide me their recommendations on who or if they needed or did not need to run their business, and that list was provided to me, and I didn't second guess the list.

26. Guidehouse segment leaders identified redundancies and synergies across the organization to determine what Guidehouse needed as it integrated GTPS into its business.

27. Individuals selected for the RIF were selected after the identification of redundancies and of who was needed to grow the Guidehouse business going forward.

28. The RIF termination decisions in the D&S segment were made by Munier John Saad, then the D&S segment leader.

29. In making RIF selection decisions, Saad focused on executive employees—Partners and Directors—in the D&S segment.

30. Saad reviewed where the executive-level employees were assigned in the D&S segment, and he made RIF selection decisions based on the organization structure, the needs of D&S, and redundancies.

31. In determining which D&S Partners and Directors were redundant, Saad tasked Bryan Miller and Vernon Butler with (i) evaluating whom they needed to effectively run the D&S business within Guidehouse's model, to support clients, and to grow the business, and (ii) identifying whom they believed to be redundant.[7]

32. Saad directed Miller—a Partner who led Guidehouse's defense work—with evaluating redundancies within the legacy Guidehouse D&S Partners and Directors.

33. Saad directed Butler—the former GTPS Growth leader and leader of the Homeland Security and Defense accounts, and new Guidehouse D&S Growth leader—with evaluating redundancies with respect to legacy GT or GTPS PPMDs assigned to D&S.

34. Although Miller and Butler were instructed to look at different populations of D&S executives, Saad asked each to consider the following in evaluating redundancies: (i) whether there was an appropriate level of staffing of senior leaders on contracts relative to Guidehouse's operating model, which calls for staffing fewer senior leaders on contracts than the GTPS staffing model; (ii) who was critical to client delivery; and (iii) who was driving business growth.

---

Dkt. 26-2 at 29:15-30:2, 30:20-31:14, 32:14-22, 34:20-35:10, 51:8-52:4, 60:17-20.  The Court notes that Saad's reliance on Butler's assessment of redundancy is captured by paragraph 51 *infra*. The Court considers this testimony as well as paragraph 51 in its understanding of the scope of the partially disputed facts but otherwise finds modification unnecessary.

[7] In Opposition, Plaintiff asserts that this fact is not supported by the record.  Dkt. 30 ¶ 31. Not so.  *See* Dkt. 26-2 at 29:20-30:2 ("[T]he process was to ask the leaders of the respective businesses [Butler and Miller] to determine who they needed to effectively run that part of the business and support the client and grow the business."); *id.* at 41:8-42:1 ("[T]he ask of each of them [Butler and Miller] . . . was . . . where do we have redundancies.").  Accordingly, this fact is properly considered, and there is no genuine dispute.

35. Saad solicited feedback on employees who were business drivers, led growth, had significant client relationships, and enjoyed track records of success. Saad considered a "business driver" to be someone who had demonstrated an ability to close large opportunities and win new work, someone who had a pipeline of work, and someone who had a consistent record of success on those fronts. Saad expected Guidehouse Directors to, at the highest level, manage large projects or a portfolio of projects; have a number of staff working for them; have primary client relationships and custody with client engagement; and be developing a pipeline of work.

36. Prior to the Acquisition, and while still at GTPS, Butler (GTPS Growth Leader and Defense and Homeland Security accounts leader) and other GT and GTPS PPMD leadership—Carlos Otal (GTPS leader) and Shivendra Verma (GTPS solutions leader)—believed that, while Guidehouse was bringing over GT and GTPS PPMDs "en masse," they anticipated redundancy or synergy actions post-Acquisition.

37. In anticipation of a potential "synergistic event" or a "[c]ost takeout of leadership positions related to redundancy," Butler, Otal, and Verma—while still at GTPS—identified and ranked certain GT and GTPS PPMDs as priority exit candidates for the anticipated post-Acquisition "synergistic event" or "[c]ost takeout of leadership positions related to redundancy," so that analysis could be shared with Guidehouse leadership.

38. As part of this pre-Acquisition synergy review, Butler, Otal, and Verma evaluated the "overall business impact and contribution" and "capability, impact, and performance" of all GT and GTPS PPMDs by considering (i) PPMD performance metrics, including profitability, net new sales, and productivity; (ii) leadership roles with respect to accounts or solutions; (iii) measures related to collaboration, teamwork, and client feedback; and (iv) overall business impact and the ability to lead, own, and drive the business.

39. Butler, Otal, and Verma memorialized the results of their pre-Acquisition synergy review and exit priority ranking in a document created prior to the Acquisition.

40. Butler, Otal, and Verma identified (i) three PPMD MDs as priority exit candidates (Roy, Douglas Criscitello, and Ariane Whittemore) and (ii) four PPMD Principals as priority exit candidates (Phil Kangas, Graeme Finley, Aurpon Bhattacharya, and Bradley Marchand).

41. Roy was identified as a priority exit candidate in the event of a synergy because (i) he was not viewed as generating new leads or driving new sales in the market; (ii) his profitability and production performance metrics were below target; and (iii) based on feedback from multiple individuals, including Mike Eder (the TSA PASS lead to whom Roy reported), Roy had not demonstrated the ability to "lead, own, and drive the business."

42. Indeed, Butler received feedback on Roy's performance from Eder, who shared that he had provided constructive feedback to Roy (i) on taking more of a leadership role on the oversight and administration of the TSA PASS contract as the overall program manager, but that a year and a half into the contract Eder was still leading project management calls, and (ii) on identifying new opportunities and task orders within TSA to drive growth and profitability of the client.

7

43. In 2021, Roy received a performance rating of "Does Not Meet Expectations," which was the lowest performance rating provided at GTPS, and the lowest rating any MD received in 2021.

44. Butler understood that Roy's "Does Not Meet Expectations" rating for 2021 was attributable to Roy's (i) failure to drive growth on the TSA PASS engagement; (ii) failure to lead and proactively manage the entire TSA PASS contract; and (iii) violations of GT's independence requirements as a public auditor, which constituted a "severe matter" and a "serious concern."

45. In 2022, Roy received a performance rating of "Meets Expectations," which was the second-lowest rating available among GTPS's four rating options, and the lowest rating any MD received in 2022.

    a. In total, five of thirteen rated MDs received a "Meets Expectations" rating. Three of the other MDs had maintained this rating from the prior year. One MD had decreased two levels from "Exceeds Expectations."[8]

46. At the conclusion of the synergy review and exit ranking process, Butler, Otal, and Verma "ranked [Roy] towards the bottom of his peer group" and identified him as an exit priority.

47. Roy has never formed the belief that Butler, Otal, Verma, Eder, or any other legacy GT or GTPS employee was ever biased against him on the basis of his race or national origin.

48. Approximately 30 days after the Acquisition, Saad and Butler discussed the legacy PPMDs that were aligned to the D&S segment and under Saad's purview.

49. Butler shared with Saad that Butler, Otal, and Verma had conducted a synergy and exit priority analysis of the GT and GTPS PPMDs and identified GT and GTPS candidates for exit in anticipation of a post-Acquisition reduction.

50. Butler also shared that of the GT and GTPS PPMDs assigned to the D&S segment, the Butler, Otal, and Verma pre-Acquisition analysis had identified Roy, Marchand, and Whittemore as priority exit candidates.

51. Saad relied on Butler to assess the GT and GTPS PPMD leaders in D&S and did not second-guess him.

52. Saad also spoke with Eder about Roy's performance and learned that Roy's performance was "lackluster" and that Roy was "not operating as expected on the TSA PASS contract."[9]

---

[8] Plaintiff does not dispute the facts asserted in paragraph 45 but asserts this additional fact. Dkt. 30 ¶ 45. The fact is supported by the record. *See* Dkt. 26-3 at 119:3-10; *id.* at 33. Accordingly, the Court includes this additional fact in its consideration of the record.

[9] Plaintiff attempts to dispute this fact on the basis that "Saad did not testify to this at his deposition. Instead, Ms. Moltzan, speaking in her representative capacity for Guidehouse, shared

53. Saad's RIF process was to align D&S executives to Guidehouse's business model, consider the feedback he solicited from others as to redundancies, and discuss that feedback with those individuals and Human Resources before sharing his final list for inclusion in Guidehouse's planned RIF.

54. In the first phase of the RIF, Saad selected 10 out of 118 D&S executive-level employees (Partners and Directors) for termination, including Roy.

55. Two of the 10 employees—Roy and Bradley Marchand–were legacy employees of GT or GTPS, while the other eight were legacy Guidehouse employees.

56. Roy was selected for the RIF based on the feedback shared by Butler and Eder.[10]

57. Although Whittemore was also identified by Butler as an exit candidate, Saad retained her, as she had been described as a key Guidehouse resource on a contract bid and could not be exited at that time because of that contract.

58. On November 3, 2022, Guidehouse notified Roy of the termination of his employment, effective November 18, 2022.

59. Guidehouse did not replace Roy.  Instead, Eder absorbed Roy's project management work on the TSA PASS contract, while continuing to run the overall engagement.

60. At no time during his Guidehouse employment did Roy ever complain of employment discrimination.[11]

---

this alleged statement."  Dkt. 30 ¶ 52.  Defendant's asserted fact is, however, supported by the record.  Dkt. 26-5 at 38:15-39:13 ("Q.  You testified that you spoke with John Saad as part of your preparation for the representative deposition.  What do you recall you said to him and he said to you?  A.  . . . John shared with me that everything that he had shared, was shared within the terms of his deposition.  So the only thing that was not is that he did have a conversation with Mike Eder about Mr. Roy.  Q.  What did Mr. Saad say about his conversation with Mr. Eder?  A.  He said he spoke with Mr. Eder about Mr. Roy, and essentially learned that he had lack luster performance and was not operating as expected on the TSA Pass contract.").  Because Plaintiff identifies no contrary evidence, this fact is properly considered, and there is no genuine dispute.

[10] Plaintiff also attempts to dispute this fact on the basis that "Mr. Saad did not testify to speaking with Mr. Eder."  Dkt. 30 ¶ 56.  For the same reasons articulated *supra*, this fact is properly considered.

[11] Defendant proffered the following additional fact: "Saad selected three additional D&S executive employees (two legacy Guidehouse employees (each White) and one legacy GT employee (White)) for termination in the second and third phases of the RIF."  Dkt. 26 ¶ 61. Plaintiff disputes this fact based on Butler's contrary testimony.  Dkt. 30 ¶ 61; Dkt. 26-3 at 108:21-109:6 ("Q.  Were you involved in phase 2 and phase 3?  A.  No.  No, in that I don't think that we had anybody in the PPMD category that were impacted at that stage?  Q.  Okay.  So for the PPMD

61. On December 28, 2022 (the "Grant Date"), Holdings issued Class B equity retention grants to those GT and GTPS PPMDs and certain non-PPMDs who remained employed by Guidehouse as of that date.

62. Because four legacy MDs—Roy, Douglas Criscitello (White), Jeffrey Lawton (White), and Robert Schein (White)—were no longer employed by Guidehouse as of the Grant Date, they did not receive a Class B equity retention grant.

63. At the time of the Grant Date, the Class B equity retention grants were 100% unvested. As provided in the Holdings Operating Agreement, all unvested Class B Membership Interests were forfeited and canceled for no consideration upon any termination of employment.

64. On December 14, 2023, the Guidehouse business was acquired.

65. The applicable proceeds from this 2023 transaction did not exceed the threshold necessary to trigger any distribution of proceeds to any of the GT and GTPS PPMDs or non-PPMDs who had received a Class B equity retention grant.

66. Consequently, no GT or GTPS PPMD or non-PPMD received any distribution of proceeds or other monetary value with respect to such Class B Membership Interests.

67. Roy alleges discrimination based on his race and national origin.

68. Roy identifies his race as Indian-American and Asian, and his nation of origin as India.

69. In connection with his employment, Roy self-identified his race/ethnicity as "Asian."

70. Roy alleges two acts of discrimination: (i) Guidehouse's purported failure to (a) assign him a manager after the Acquisition or (b) provide him with the guidance he needed to integrate into Guidehouse; and (ii) the termination of his employment.

71. Roy does not recall being assigned a manager after the Acquisition (which, in fact, he was).[12]

72. Roy did not and does not know if Guidehouse assigned a manager to any other legacy PPMD or other GTPS employee after the Acquisition or notified such employees of any such manager selections.

---

purposes, it was effectively only one phase? A. Correct. With Brad Marchand and with Manosij."). Accordingly, the Court has omitted this fact.

[12] Plaintiff attempts to partially dispute this fact, citing his own deposition testimony that he "hardly interacted" with Moshe Nelson and that he doesn't "know if [Nelson] has ever sat with [Plaintiff] and talked about professionally [sic] other than saying hello a few times in the cafeteria." Dkt. 26-1 at 166:13-167:6. This testimony does not create a genuine dispute of the fact asserted.

73. Roy did not and does not know any reason or basis why he purportedly was not given the guidance he needed to integrate into Guidehouse.

74. Roy did not and does not know if any other GT or GTPS PPMDs failed to receive the guidance that they needed to successfully integrate into Guidehouse.

75. Roy did not and does not know if any of the legacy GTPS employees received any of the guidance that he purportedly did not receive or if anyone received guidance on the integration at all.

76. Roy alleges that Guidehouse made little effort to integrate any of "the employees acquired from Grant Thornton into its operations."

77. Roy cannot identify any legacy GTPS employee who was treated differently than he with respect to the integration.

78. Roy did not and does not know of any integration efforts outside of his D&S segment.

79. Roy never reached out to anyone within Guidehouse as to any question he had about integration into Guidehouse.[13]

80. Roy surmises that his termination was discriminatory because (i) he had been notified of his potential Class B equity retention grant in connection with the Acquisition, and there was a short period between that notification and his termination, (ii) he believed he had a very strong technical skill set, and (iii) in the first phase of the RIF, he and three other Indian-American employees were terminated (Verma, Aurpon Bhattacharya, and Naval Aggarwal).

81. Roy has alleged that Guidehouse "disproportionally selected employees who belonged to the same protected class as [him] in furtherance of a reduction in force."

82. Roy did not and does not know who selected him for termination in the RIF.

83. Roy did not and does not know who was consulted about or involved in his selection in the RIF.

84. Roy did not and does not know the process or criteria that were used in connection with his inclusion in the RIF.

85. Roy did not and does not know how the RIF was structured.

---

[13] Plaintiff attempts to dispute this fact, citing his own deposition testimony (1) that he did not have "enough time"; (2) that his "main goal" was to "keep the business going so [his] accounts stay alive" and that he did not "think of those – these things"; and (3) that he did not "even know who to ask that." Dkt. 26-1 at 257:1-18. This testimony does not create a genuine dispute of the fact asserted.

86. Roy did not and does not know the overall size of the RIF.

87. Roy did not and does not know how many waves or phases of the RIF occurred.

88. Roy did not and does not know how many employees were terminated around the same time that he was terminated as part of the RIF.

89. Roy did not and does not know the population that was considered for the RIF.

90. Roy did not and does not know if the RIF involved employees who were not GT or GTPS PPMDs.

91. Roy did not and does not know the racial or national-origin composition of the population considered for the RIF.

92. Roy did not and does not know how many of the employees selected in the RIF were legacy Guidehouse or legacy GTPS employees.

93. Roy did not and does not know how many of the employees selected in the RIF were in his D&S segment.

94. Roy did not and does not know how many employees (or who) were considered for the RIF but retained.

95. Roy did not and does not know how many Indian-Americans worked at Guidehouse.

96. Roy did not and does not know how many employees in the combined Guidehouse/GTPS workforce after the Acquisition were Asian, Indian-American, or of Indian national origin.

97. Roy did not and does not know which other employees were selected for termination in the RIF other than Aggarwal, Bhattacharya, Verma, and Paul Seckar (White).

98. Aggarwal, Bhattacharya, and Verma—legacy GT Principals who identify as Asian and who were selected for termination in the RIF—worked in Guidehouse's Energy, Sustainability, and Infrastructure ("ES&I") business segment.

99. Saad had no responsibility for the ES&I segment, which was led at the time by Jan Vrins.

100. Roy did not and does not know who Aggarwal's, Bhattacharya's, or Verma's segment leader was.

101. Roy did not and does not know who made the decision to select Aggarwal, Bhattacharya, or Verma for termination in the RIF.

102. Roy did not and does not know the criteria or process used to select Aggarwal, Bhattacharya, or Verma for the RIF.

103.     Roy did not and does not know Aggarwal's, Bhattacharya's, or Verma's performance metrics, performance ratings, or performance feedback at GT or GTPS, or how their performance compared against their peers.

104.     Only six out of the 109 employees (approximately 5.5%) selected for termination across the overall RIF identify as Asian, while 103 of the 109 employees (approximately 94.5%) selected for termination identify as non-Asian.[14]

105.     Only four of the 49 employees selected for termination in the first phase of the wave identified as Asian; only two of the 45 employees selected for termination in the second phase of the RIF identified as Asian; and none of the 15 employees selected for termination in the third phase identified as Asian.[15]

    a.  In Wave 1, for the Decisional Unit "ESI Client Service Executive," Job Category "Partner," the number of Asians (3 of 5) vs. Non-Asians (4 of 33) selected was statistically significant.

106.     Only one of the 13 total employees in the D&S executive unit who were selected for termination in the RIF (Roy) identifies as Asian, while the other twelve identify as White.[16]

107.     Paul F. White, Ph.D., prepared an Expert Report in this matter based on his review of workforce data relevant to the RIF.

---

[14] In Opposition, Plaintiff asserts that, "at least four [of the six employees selected in the RIF] are Indian-American and all were selected in Phase I." Dkt. 30 ¶ 105. However, the citation that Plaintiff provides appears to support only that there were four Asians selected for termination in Wave 1 and two Asians selected in Wave 2 of the RIF (which are both noted as not statistically significant). Dkt. 26-7 at 51. Accordingly, Plaintiff fails to dispute this fact.

[15] In Opposition, Plaintiff asserts that, "[a]ll four of the 49 employees selected for termination in the first phase of the wave were Indian-American." Dkt. 30 ¶ 106. Again, the citation provided by Plaintiff does not support this assertion. Dkt. 26-7 at 51. Plaintiff further asserts that, "the Defense's own expert noted that the selection of Mr. Aggarwal, Bhattacharya, and Verma in Phase I was statistically significant." Dkt. 30 ¶ 106. The cited material shows that, in Wave 1, for the Decisional Unit "ESI Client Service Executive," Job Category "Partner," the number of Asians vs. Non-Asians selected was statistically significant. Dkt. 26-7 at 54. Although this does not dispute the asserted fact and this category does not include Plaintiff, the Court nonetheless includes it as an additional fact.

[16] In Opposition, Plaintiff attempts to dispute the fact by asserting that (1) Plaintiff was the only Indian-American employee in the D&S executive unit, and that (2) he was one of only two legacy Grant Thornton employees selected in any phase of the RIF. Dkt. 30 ¶ 107 (citing Dkt. 26-3 at 108:21-109:6). Neither of these contradict the fact and thus there is no genuine dispute of fact.

108.        White's Expert Report concluded that there was "no statistical evidence" that Guidehouse disproportionally selected Asian or Indian employees for termination (i) in Roy's D&S executive unit, (ii) at the company-wide level during any of the three waves of the RIF, or (iii) at the U.S. company-wide level across the overall RIF.[17]

## III.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact."  *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

## IV.  ANALYSIS

In the Complaint, Plaintiff asserts claims for (i) discrimination based on race and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), (ii) discrimination based on race in violation of 42 U.S.C. § 1981 ("Section 1981"), and (iii) discrimination based on

---

[17] In Opposition, Plaintiff attempts to dispute this fact by asserting that (1) "Mr. White's report does not take into account that Mr. Saad uncritically accepted the recommendations of Vern Butler in determining which legacy Grant Thornton employees to let go," Dkt. 30 ¶ 109 (citing para. 51); (2) "Mr. White's report does not compare the termination of Indian employees to white employees, only weighing them against all non-Indian employees," *id.* (citing Dkt. 26-7); and (3) "Mr. White does conclude that there is statistically significant evidence that at least some Indian-American employees were disproportionately fired," *id.* (with no citation).  To the extent these assertions are supported by the record, they do not contradict the fact asserted.

race and national origin in violation of the Virginia Human Rights Act ("VHRA").  Dkt. 1.

Defendant has moved for summary judgment on each of Plaintiff's claims.[18]

As a preliminary matter, like the parties, the Court analyzes all of Plaintiff's claims together, as the elements required to establish discrimination under Title VII, Section 1981, and the VHRA are the same.  *See, e.g.*, *Beckford v. Elevance Health, Inc.*, 2026 WL 595437, at *1 (4th Cir. Mar. 3, 2026) (unpublished) (applying same elements to race-related claims under Title VII, Section 1981, and VHRA in RIF case); *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) ("Love–Lane asserts her discrimination claims under three federal statutes, Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.  Love–Lane proffers a circumstantial case, and the elements required to establish such a case are the same under all three statutes."); *McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims  are  analyzed  together  "because Title VII and  the VHRA use substantially identical language").

Under each of these statutes, a plaintiff has two potential avenues to avoid summary judgment.  *First*, he may proceed under a *McDonnell Douglas* burden-shifting framework.  *Id.* *Second*, "[h]e may, under what has been referred to as the 'mixed-motive' framework, present direct or circumstantial evidence that creates a genuine issue of material fact as to whether an impermissible factor such as race solely or partially motivated the employer's adverse employment decision."  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206 (4th Cir. 2019) (citing *Diamond v.*

---

[18] In his Opposition, Plaintiff (1) concedes that he does not assert a disparate impact claim, Dkt. 30 at 14, and (2) relies solely on his termination as the adverse action at issue in this case, Dkt. 30 at 16-19.  Accordingly, the Court construes the Complaint to only assert disparate treatment claims based on Plaintiff's termination.

*Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005)).  The Court analyzes Plaintiff's claims under each in turn.

## A.  *McDonnell Douglas* Framework

To establish a *prima facie* case for discrimination in the context of a RIF, a plaintiff must "establish (1) that [he] was in a protected class, (2) [he] was selected for [termination], (3) [he] was performing [his] job at a level that met the employer's expectations, and (4) that [his] employer did not treat the protected status neutrally, or there were other circumstances giving rise to an inference of discrimination." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 720–21 (4th Cir. 2002) (citations omitted).  Only after the plaintiff establishes the *prima facie* case must the employer then present a "legitimate, non-discriminatory reason for the employment action." *Id.* at 721.  "If the [employer] meets its burden of production, the presumption raised by the *prima facie* case is rebutted and 'drops from the case.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981).  At that point, the plaintiff carries the ultimate burden of proving intentional discrimination, and this may be done by showing that the employer's legitimate, non-discriminatory reason was a pretext. *Id.*

### i.  *Prima-Facie* Case

As to the *prima facie* case, the parties focus on the fourth element: whether there are circumstances giving rise to an inference of discrimination.  Dkt. 26 at 30-31; Dkt. 30 at 17-18.  In support of this element, Plaintiff presents Ariane Whittemore, Kathleen Sifer, Ariane Carpenter, Douglas Criscitello, and Priya Mhatre as potential comparators.  Dkt. 30 at 17-18.  To proceed based on a theory of similarly situated comparators outside the protected class, a plaintiff must "provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated in *all* respects.'" *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir.

2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  To that end, the plaintiff must prove that he and the comparator "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (cleaned up).  To be sure, "a comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Id.* at 223 (cleaned up).  Nonetheless, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."  *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

Beginning with Whittemore, it is undisputed that both Plaintiff and Whittemore were identified as priority exit candidates.  Dkt. 30 ¶ 40.  It is also undisputed that, unlike Plaintiff, Whittemore was retained because "she had been described as a key Guidehouse resource on a contract bid and could not be exited at that time because of that contract."  Dkt. 30 ¶ 57.  In Opposition, Plaintiff argues that there is a genuine issue as to discriminatory motive because the record also shows that Plaintiff "was bid as one of four key personnel as the program manager based on the solicitation criteria" for the TSA PASS engagement that was won in early 2021.  Dkt. 30 ¶ 5.  However, there is no evidence in the record that anyone believed Plaintiff's termination would cause a corresponding problem with the TSA PASS contract or that a reasonable person would have believed that it would cause such a problem.  Indeed, it is undisputed that, following Plaintiff's termination, "Eder absorbed [Plaintiff]'s project management work on the TSA PASS contract, while continuing to run the overall engagement."  Dkt. 30 ¶ 59.  There is also no evidence in the record that Whittemore had received a "Does Not Meet Expectations" rating like Plaintiff.

17

Accordingly, the undisputed record does not show that Plaintiff and Whittemore were similarly situated.

The Court thus turns to Sifer, Carpenter, Criscitello, and Mhatre, the other managing directors who had received the same performance rating as Plaintiff in the year immediately preceding the Acquisition. Dkt. 30 at 16 ("These facts demonstrate, via both direct and circumstantial evidence, that Mr. Roy was treated differently than similarly situated white colleagues."); Dkt. 26-3 at 33. It is undisputed that, the year before, Plaintiff had received a performance rating of "Does Not Meet Expectations," which was the lowest performance rating provided at GTPS, and the lowest rating any MD received in 2021—lower than each of these asserted comparators. Dkt. 30 ¶ 43; Dkt. 26-3 at 34. Moreover, it is undisputed that Butler, the *de facto* decisionmaker as to Plaintiff's termination, understood that Plaintiff's "Does Not Meet Expectations" rating was attributable to Plaintiff's (i) failure to drive growth on the TSA PASS engagement; (ii) failure to lead and proactively manage the entire TSA PASS contract; and (iii) violations of GT's independence requirements as a public auditor, which constituted a "severe matter" and a "serious concern." Dkt. 30 ¶ 44. There is nothing in the record to suggest that any of the potential comparators had the same issues. Additionally, the record shows that, like Plaintiff, Criscitello and Sifer *were* terminated during the RIF. Dkt. 26-6 ¶ 6(g) (Criscitello); Dkt. 31-2 ¶ 3(b) (Sifer). And Mhatre, like Plaintiff, identifies as Asian, and is thus not outside the protected class—indeed, her retention appears to undercut Plaintiff's assertions of bias. Dkt. 31-2 ¶ 3(c). Accordingly, none of these proposed comparators are similarly situated.

Plaintiff also proffers that "[t]wo other Indian-American employees, Naval Aggarwal and Shiva Verma, who were not identified as having 'exit potential' were fired the same day as Mr. Roy." Dkt. 30 at 17. But it is undisputed that these employees worked in a different segment than

18

Plaintiff, over which Saad had no responsibility, and about whom Plaintiff has no evidence regarding their comparative performance to their peers. Dkt. 30 ¶¶ 99-105. Accordingly, the mere fact that Aggarwal and Verma were also terminated during the RIF does not give rise to an inference of discrimination.

Indeed, the final evidence that Plaintiff proffers is Defendant's expert's statistical analysis. As a preliminary matter, "it is well-settled in the Fourth Circuit that 'statistics alone cannot establish a prima facie case of individual disparate treatment.'" *Earl v. Norfolk State Univ.*, 2014 WL 2916718, at *22 (E.D. Va. June 26, 2014) (citation omitted). Specifically, Plaintiff notes that, in Wave 1, for the Decisional Unit "ESI Client Service Executive," Job Category "Partner," the number of Asians (3 of 5) vs. Non-Asians (4 of 33) selected was statistically significant. Dkt. 30 at 14; Dkt. 26-7 at 54. But Plaintiff was neither a part of this unit, nor this job category. Indeed, for what Plaintiff argues is the "most relevant comparison," Indian employees vs. non-Indian employees of Plaintiff's level within the Defense & Security Segment, Defendant's expert found no statistical significance. Dkt. 26-7 at 13. Although Plaintiff takes issue with the threshold adopted by Defendant's expert for statistical significance, the threshold used (a probability value of less than 5%) is a well-settled as a reliable measure. *See, e.g.*, *Brown v. Nucor Corp.*, 576 F.3d 149, 156 n.9 (4th Cir. 2009) ("The Supreme Court has indicated that anything greater than two or three standard deviations in racial discrimination cases is suspicious. We will presume that two standard deviations is the proper threshold . . . . [A] threshold of two standard deviations corresponds roughly to a 95% confidence level or a .05 level of significance, i.e., there is only a 5% probability that the result is due to chance. Three standard deviations would equate to a 99.7% confidence level."); *Jones v. City of Boston*, 752 F.3d 38, 46-47 & n.9 (1st Cir. 2014) ("[A] [probability]-value of five percent, or 1.96 standard deviations, [is] the threshold [for statistical

19

significance] most commonly used by social scientists.  Most federal courts have also settled on this threshold in analyzing statistical showings of disparate impact.") (collecting cases).  Accordingly, this other circumstantial evidence also fails to show that Defendant did not treat the protected status neutrally, or that there are other circumstances giving rise to an inference of discrimination.  Indeed, it is undisputed that, until his termination, Plaintiff neither experienced nor suspected any of the alleged decisionmakers of any bias against him based on any of his protected characteristics.

For all of these reasons, Plaintiff has failed to meet his burden to establish a *prima facie* case of discrimination.  Nonetheless, even if Plaintiff had met his burden, his claims would still fail under the remaining two steps of the framework.

### ii.  Legitimate, Non-Discriminatory Reason

Assuming that Plaintiff had established a *prima facie* case, Defendant would then be required to present a "legitimate, non-discriminatory reason for the employment action."  *Dugan*, 293 F.3d at 721.  Here, Defendant has shown, and Plaintiff has not disputed, that Plaintiff's termination was part of a nationwide, multiphase RIF implemented following the acquisition of Plaintiff's prior employer by Defendant.  *See, e.g.*, Dkt. 30 ¶¶ 1-3, 20-22.  In total, the RIF resulted in 109 terminations.  Dkt. 30 ¶ 22.

Specifically, as to Plaintiff, it is undisputed that Butler identified Plaintiff as a priority exit candidate because (i) he was not viewed as generating new leads or driving new sales in the market; (ii) his profitability and production performance metrics were below target; and (iii) based on feedback from multiple individuals, including Eder, Roy had not demonstrated the ability to "lead, own, and drive the business."  Dkt. 30 ¶ 41.  Indeed, in 2021, Plaintiff received a performance rating of "Does Not Meet Expectations," which was the lowest performance rating provided at

20

GTPS, and the lowest rating anyone at Plaintiff's level received in 2021. *Id.* ¶ 43. Butler understood that this rating was attributable to Plaintiff's (i) failure to drive growth on the TSA PASS engagement; (ii) failure to lead and proactively manage the entire TSA PASS contract; and (iii) violations of GT's independence requirements as a public auditor, which constituted a "severe matter" and a "serious concern." *Id.* ¶ 44. At the conclusion of the synergy review and exit ranking process, Butler, Otal, and Verma "ranked [Roy] towards the bottom of his peer group" and identified him as an exit priority. *Id.* ¶ 45. Notably, it is also undisputed that Plaintiff has never formed the belief that Butler, Otal, Verma, Eder, or any other legacy GT or GTPS employee was ever biased against him on the basis of his race or national origin, *id.* ¶ 47, and that Saad relied on Butler to assess the GT and GTPS PPMD leaders in D&S, including Plaintiff, and did not second-guess him, *id.* ¶ 51. Accordingly, Defendant has met its burden to produce a legitimate, non-discriminatory reason for Plaintiff's termination—namely, his performance in relation to the needs of the business following the Acquisition.

### iii. Pretext/Intentional Discrimination

"If the [employer] meets its burden of production, the presumption raised by the *prima facie* case is rebutted and 'drops from the case.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981). At that point, the plaintiff carries the ultimate burden of proving intentional discrimination, and this may be done by showing that the employer's legitimate, non-discriminatory reason was a pretext. *Id.* Here, Plaintiff makes two arguments in support of pretext.

Plaintiff first argues that Defendant's reasoning is pretextual because "Guidehouse claimed that one very important factor in determining which PPMDs to release was their utilization, while Mr. Saad testified that utilization was not an important factor for individuals at Mr. Roy's level."

Dkt. 30 at 18. To be specific, Saad testified that "utilization probably wouldn't be an important factor for people at this level . . . [b]ecause they're spending more time on client development at our director and partner level in the Guidehouse model" and that, because of that, "[u]tilization in and of itself isn't a great indicator." Dkt. 26-2 at 53:17-54:11. But none of this is inconsistent with Defendant's explanation of Plaintiff's termination, which relied both on Plaintiff's low utilization, as well as his failure to "generate new leads," "drive new sales," "drive the business," "drive growth on the TSA PASS engagement," and "lead and proactively manage the entire TSA PASS contract," as well as his prior violations of GT's independence requirements. Dkt. 30 ¶¶ 41, 43, 44.

Plaintiff also argues that any reliance by Defendant on redundancy in his case is pretextual because no one shared his duties. Dkt. 30 at 16. In support of his argument that he was not actually believed to be redundant, Plaintiff points only to Defendant's corporate designee's testimony that, "considering synergies and having two or three people in a box," to her knowledge, no one else "was . . . in a box with [Plaintiff]." Dkt. 26-5 at 34:16-20. Both standing alone and in light of the significant undisputed record evidence in the case recounted *supra*, the Court finds that this vague statement is insufficient to create a genuine issue as to pretext. Moreover, even if the Court were to interpret the statement as Plaintiff does, *i.e.* as an admission that no one shared Plaintiff's duties, if his duties could be absorbed by someone else (as did, in fact, happen in this case), he could still be considered "redundant." Accordingly, this testimony too does not raise a genuine issue as to intentional discrimination.

\*\*\*

22

Because Plaintiff fails at step one and, alternatively, step three of the relevant *McDonell Douglas* framework, he fails to defeat summary judgment on this basis. Thus, the Court turns to Plaintiff's arguments under the mixed-motive framework.

### B.  Mixed-Motive Framework

Under the "mixed-motive" framework, "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). "[T]he impermissible factor need not have been the sole factor." *Id.* "As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice." *Id.*

Here, Plaintiff presents three sets of circumstantial evidence to advance his theory under this framework. Dkt. 30 at 16. *First*, Plaintiff again asserts that Adrianne Whittemore is a similarly situated comparator. *Id.* *Second*, Plaintiff again argues that Defendant's proffered legitimate reason for his termination (redundancy) was pretextual because no one shared his duties. *Id.* *Third*, Plaintiff again proffers Sifer, Carpenter, Criscitello, and Mhatre as similarly situated comparators. For the reasons explained *supra*, however, these comparators are not similarly situated and otherwise do not raise a genuine issue of material fact as to whether Plaintiff's race or national origin was a motivating factor in Plaintiff's termination. Moreover, as explained *supra*, Plaintiff's assertions of pretext based solely on Defendant's corporate designee's testimony that, to her knowledge, no one else "was . . . in a box with [Plaintiff]," also fail to raise a genuine issue regarding motivation. Dkt. 26-5 at 34:16-20. Ultimately, even considering all of this circumstantial evidence together with the record as a whole in this matter, Plaintiff has failed to "raise[] a genuine issue of material fact as to whether an impermissible factor such as race

motivated the employer's adverse employment decision." *Diamond*, 416 F.3d at 318 (4th Cir. 2005). Thus, Plaintiff also fails to defeat summary judgment under this framework.

***

In sum, the evidence at summary judgment does not support any inference or suggestion of discrimination. Rather, as Plaintiff testified at deposition, he merely surmises that he was discriminated against because he had previously received notification of a potential equity retention grant, he believes he had very strong technical skills, and, of the 49 employees terminated in the first phase of the RIF, 4 were Indian-American. Dkt. 26-1 at 180:11-185:12. Such suppositions and intuitions are not enough at summary judgment. Accordingly, the Motion will be granted.

V. CONCLUSION

Accordingly, it is hereby ORDERED that the Motion (Dkt. 25) is GRANTED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment against Plaintiff Manosij Roy and in favor of Defendant Guidehouse, Inc. and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
July 21, 2026

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge